Good morning and welcome to the Ninth Circuit. We've submitted a number of cases this morning, but the case for argument, as you well know, is National Payment Systems v. BSR Acquisition Company. You may proceed. May it please the Court, my name is Oliver Griffin. I'm a lawyer at a law firm named Kutek Rock. I represent Appellant today, and I thank the Court for its time and its energy that it put into reviewing this, whether it's today or after my argument. Much appreciated. We put a lot of energy in before, so you're going to find this a pretty hot panel. Fantastic. Or if we don't ask you questions, it's because your briefing on both sides has actually been very comprehensive. Well, I wanted to start with very short facts, only because I want to apply them to the law that I think is most important for the Court to analyze today. The parties have a contract, had a contract, where my client would generate merchant accounts and then the defendant, in this case the appellee, would process those accounts. It's important to just kind of understand that basic framework of the business when I get to the serious question analysis. As part of my client's obligations, they really go out and they find merchants, they do this ordinarily by contracting with telemarketing firms. These people can be known as subagents. They could be known as just contracting parties with my client, Boom. And what they do is they call the merchants and they ask them if they would like to switch their credit card processing accounts, things of that nature. After the merchant is signed up, then the merchant is then boarded at Aurora, in this case the appellee. And that transaction, the boarding of the merchant, generates residuals. So when my client finds the merchants and then boards them with Aurora, Aurora then processes those credit card receipts with banks and pays downstream to us. So this is the commission that gets charged for processing the credit card? That's correct, Your Honor. So in our case, there was something like 17,000 merchants over the period of the relationship, and that 17,000 merchants over a period of years, five years or so, generated a $1 million per month residual. So this is the $1 million a month that is at issue. That's cited in the appellee's brief. In our brief, I think we talk about $600,000, $700,000, $800,000, because at the time it was uncertain exactly what the dollar amount was. However, you counted it serious money. It was serious money, but that's what I'm going to get to. It's funny you say that, Your Honor, because it's much more serious money than $1 million a month. The way that these residuals work in the industry is that they have about a 40 times multiple to them when they're sold. So if you have a $1 million a month residual stream coming to you and you want to sell that stream to some buyer somewhere, and these are very marketable portfolios, it's $40 million. And so, you know, that's more than what seems initially to be at issue when you read $1 million a month. And $40 million, that's significant motivation for people, in my estimation, to act a certain way that they did. Can we get to the heart of the matter, though? Of course. And I appreciate that this is a lucrative situation as you describe it, but my question really goes to this minimum production requirement, which is in the contract. Would you address that? And does it have any effect vis-à-vis what you've just called the downstream revenue? Okay. So the 2-6-2 merchants every six-month provision, which was one of the basis of the termination, the record reflects in our estimation that there was a serious question as to whether or not Aurora had freed us from boarding on the 2-6. In the fall of 2019, my client and the defendant entered into various negotiations to modify their relationship. There were releases. There was amendments to various contracts, things of that nature. The e-mail in the record from Brian Gowdy, the defendant's corporate representative, is the dispositive e-mail regarding the 2-6. Counsel, the problem I have with that argument is that it wasn't incorporated into the written agreement. It was negotiation. And there's basically a clause in the contract that says if it's not in writing, all of these other communications are irrelevant to the agreement. Yes, Your Honor, but that's when you have to go to estoppel. When Mr. Gowdy said to Mr. Hines, you're free from boarding with us, Mr. Hines freed himself from boarding with them. Not another merchant after 17,000 merchants, not another merchant was boarded with them after that. Wasn't that agreement memorialized in writing in the modifications to the contract? Well, you know, that's a question that can never be answered, but I'll tell you. It's a basic contract law issue, isn't it? Well, so is estoppel. So estoppel is a basic contract law issue. If a party ---- Well, but how is that estoppel? I mean, if it's single e-mail, we have a requirement that everything be in writing. And as you know, estoppel is kind of a tough mountain to climb. That's where I'm having trouble. I can see the argument, okay, well, then there was this negotiation, but then I'm kind of left, but now what? Well, yeah, and I understand that, Your Honor. We did this at the injunction proceeding, and what we tried to demonstrate was that the course of dealing after the e-mail that said you're free from boarding indicated that we relied on Mr. Gowdy's representation that we were free from boarding, we stopped boarding, that we were taken off the first data processing platform. Mr. Gowdy only says later, well, I thought you were only going to stop boarding with first data. I thought you were going to start boarding with TSIS. But we had our own TSIS boarding platform, so I found that response to be disingenuous. If a party relies to their detriment on the actions of, in this case, Mr. Gowdy, which are completely contrary to the actions that he took after the you're free from boarding e-mail, and just understand for a moment, Your Honor, it's not just an e-mail. This is a relationship built over five years where the parties talk to each other probably on a daily basis, if not four or five times a week regarding merchants and accounts and things of that nature. Let's assume that we agree with you on the estoppel issue. The district court, Judge Tucci, also found that your client violated the non-solicitation clause of the agreement, which was still in the agreement and binding upon you. Tell me how his factual findings, and he made the factual finding that your client did solicit in violation of the agreement, how that violates the abuse of discretion, Steve. Well, there's two non-solicitations. Are you talking about the Adam Spencer hire, Your Honor, or are you talking about the merchant account? Either one. Okay, well, Judge Tucci didn't find that we violated the non-solicitation. Judge Tucci did find that he thought the evidence. Yeah, I'm looking at page 7, ER 9 of his order. Yeah. Line 10, the evidence presented shows that Boom likely violated the non-solicitation clauses, section 5.8 of the ICA, which provides as follows. Right, and you're right, and that's why it says likely, because Judge Tucci, in his review of the facts, did not apply any of the actual serious questions going to the merits of the case. That's the error that we're here for today, as far as I'm concerned. Let me answer your question, Your Honor. When the evidence was reviewed for the non-solicitation of the two merchants out of 17,000, when that evidence was reviewed, in the one case, the DA gallery case, it was an issue of a subagent trying to sell leasing equipment, not processing equipment. In the second one, and the name escapes me right now, there was an issue of the telemarketer talking about the relationship is no longer with Aurora, never solicited, never offered new services, never asked them to breach. None of the ordinary things that would happen in a solicitation. When I asked Mr. Gowdy about that, when I asked him specifically about those two merchant issues, the non-solicitation, Mr. Gowdy, I said to him, there is certainly a large question that exists about whether those merchants went relative to my client. Would at least you agree with that? Answer, yes, that's fair. On the second one, Your Honor, okay, would you agree with me that there's a serious question regarding the sales volume attrition? Answer, yes, that's the outcome. That's on ER 317 and ER 332. Counsel, let me follow up on Judge Hawkins' question. I would like to refer you to page 8 of the district court's order at line 14, where it recites, the court finds that the solicitation was clear and does not require a tortured interpretation of the conversation, as Boom argues. That's a pretty solid finding of fact that you've reached the solicitation. You'd think so, but what I just read to Your Honor, when I asked Mr. Gowdy, don't you believe there are serious questions going to both the merchant attrition and going to. So is your argument that the district court committed a clear error in the face of that, because that's what we would have to find. My argument is that when. My question. Yes, Your Honor. I believe he committed clear error, and this is why. When we went into the hearing on May 3rd or so, the issue before the court, the primary issue under the alliance test was, is there a reparable harm to my client? We proved that there was a reparable harm by bringing in an expert, by testifying with Mr. Hines, and understand, please, Your Honor, that there was no direct testimony. This was an affidavit case where you could cross-examine on affidavits. We bring in irreparable harm that the business is threatened to go extinct, that there is enterprise value loss, which goes to goodwill. And why in the end isn't that money? Because as the district court said, basically, in the end, this case is all about money. And as we know, this kind of injury is typically compensable by money. Well, the two cases that we cite that address that are both for goodwill, loss of enterprise value, and the threat of going out of business, this court has found that those injuries are enough to show irreparable harm. In the flip-flop franchise case and the high-Q labs case, both 2016 and 2019, Ninth Circuit, once we showed irreparable harm, once we showed that, and it was uncontroverted, the defendants didn't cross-examine our expert, and they never put up evidence to contradict irreparable harm, then there should have been a balancing of the equities regarding that. But that doesn't answer Judge McEwen's question. That's still money damages. It's not irreparable in that regard. And the district court's finding, as I understand it, goes to the likelihood of success on the merits in balancing whether or not you're entitled to injunctive relief. And let me just add that district court also said if we sidestep likely to prevail on the merits and we go to what you're arguing, which is a serious question, I still don't find that there's irreparable harm enough to tip the balance. And so we would have to determine that that was a serious error in terms of question of fact or law. Well, and I came in today knowing I'd have to respond to a hot bench, but I came in today to talk about the balancing, the tipping of the harm, because my understanding of the error of law here is based on an error of fact. When we proved irreparable harm, uncontroverted, and they don't dispute that, they don't dispute that we proved and we showed irreparable harm, then there should have been a, well, what's the harm going to be to the defendant if I do issue the injunction? That's the balancing of the equities. And it has to tip sharply in our favor. We cite in the brief on ER 347 this business about the company's doing better than it's ever been. But I want to read you the census before that. I ask Mr. Gowdy, if you don't give them, if you don't turn the money back on, you have no evidence in your declaration that they won't suffer irreparable harm, isn't that true? Answer, I don't. And my next question for you is, did you, the $600,000 or $700,000 or $800,000 a month, that dollar amount is in dispute, do you need that to run Aurora's operations? Answer, no. Question, is it your testimony that Aurora was doing just fine without the money? Answer, yes. So if you show irreparable harm and then the court has to analyze it under the tipping of the balance, it tips to us 100% to zero. There's nothing that harms Aurora if the injunction were to issue. By Mr. Gowdy's own testimony, it's not in the record. So if I show irreparable harm, uncontroverted, and then the balancing of equities tips in our favor by their own admission that they don't need the $800,000 a month, and I raise serious questions going to the merits that the DA gallery merchant wasn't solicited for changing their processing but was only solicited for the leasing and the other person there was no solicitation language in the call. When Judge Tucci found that both sides are going to go bankrupt so I'll just pick one, that was an enormous error of fact. We proved beyond a shadow of a doubt that it tips 100% to zero in our favor and there was no public policy finding one way or the other in his opinion. So under the four elements of alliance, irreparable harm, otherwise known as no adequate remedy at law, we have two cases supporting going out of business, threatening to go out of business, loss of goodwill, loss of enterprise value, again, not controverted. It goes then to tipping of the equities. We showed harm. They said they don't even need the money. Now we know now that that's not true, but that's not for this panel. So if we win 100% of irreparable harm, 100% of tipping of the equities, I ask Mr. Gowdy on cross-examination as to serious questions regarding his own allegations and he admits it, and Judge Tucci then says, I'm not going to get to the serious question test because I think that you're not likely to prevail in the merits. Well, that's a misunderstanding of the serious question test. Likelihood of success on the merits isn't in the serious question test. The serious question test plus tipping of balancing of harm takes the place of likelihood of success on the merits. That's the whole point. If the movement shows that there are serious questions going to the merits, irreparable harm, and the balance tips in your favor, then injunction shall issue. That's an abuse of discretion. Your argument is in that case it doesn't matter if your client has breached the agreement. There's no finding a breach, Your Honor. It says likely. He didn't apply the proper standard. I'm asking this panel to remand it back to Judge Tucci and look at the evidence through the serious question test. That's what I'm asking. He didn't do it. I asked him to do it. We provided the evidence for him to do it. We didn't skimp on it. We didn't miss things. We didn't waive our rights. We didn't miss legal arguments. But Judge Tucci decided, however, that because he listened to some recordings, we had no cross-examination of these recordings. I'd like to just bring the Court's attention. District Court judge must choose the course of action that will minimize the cost of being mistaken because he is forced to act on an incomplete record. That's the lower loss in products for Arnett case. That's exactly what happened here. We had a day and a half, maybe two and a half days, if I remember the whole thing, constantly interrupted. Lunch breaks, Ninth Circuit judicial conferences, in the middle of the testimony. And I had a weird feeling that maybe the message wasn't coming across. We were on Zoom. The witnesses were in different states. There was time zone issues, all these other things. And when the opinion came out and the word likely was used over and over again, there's a likely breach, likely breach. I see I have three minutes. Do you want to save the remaining time for rebuttal? I'll save one minute. All right. Okay, so the cornerstone of Judge Tucci's error is that he did not, there was a mistake of fact that the balancing of the hardships were equal. There's no evidence in the record of that. Counsel, you just said that there was no finding of breach. But, again, I refer you to page 8, lines 20 through 25, where he writes, without the benefit of discovery, the evidence already shows that Boom improperly attempted to solicit BSR's merchant customer in DA Gallery. And the same can be said for Chiefs Bar and Grill. I mean, I don't see how you can say that he didn't find a breach as a result of the violation of the non-solicitation clause. Well, you know, Your Honor, I think if serious question tests have been applied to the facts, then he wouldn't have found that. When Mr. Gowdy, the CEO and the 30B6 designee, says that there are serious questions going to both attrition rates and DA Gallery merchant solicitation, I don't know how the court says, well, I don't care what he says. I find that there's a breach. I mean, this was a short hearing. We asked for injunctive relief. It would have preserved the status quo. It would have caused them no damages, zero. The problem for us is that we have to look at this through the lens of what was before the district court. And we all acknowledge it was a very preliminary stage of the litigation. But you have a pretty high burden in order to show entitlement to injunctive relief at that stage. Well, I think I have a lower burden than likelihood of success on the merits. I think that's what the law is. That's what I went into the hearing trying to use that law. And that's what I'm coming into today. The last thing I'll add is that the cornerstone of this Judge Tucci opinion where he says both sides will go broke, so pick one, huge mistake. The motion for bond, which was not even reviewed because he said it wasn't part of an injunction proceeding, that was to show that if there's a judgment in 18 months, they can't pay it. A company being unable to pay a judgment in 18 months is also irreparable harm. It wasn't meant to show that they were broke at the time. And I just read into the record that Mr. Gowdy said they were doing the best they ever have. I've got 30 seconds left. I might as well reserve it. All right. Thank you. You may proceed. Good morning, Your Honors. May it please the Court. My name is Charles Preter. I'm with the law firm Waller, Lansden, Dorch and Davis in Birmingham, Alabama. That is a mouthful, huh? Yes, Your Honor. My partner, Derek Edwards, is with Waller in Nashville, Tennessee, and we represent the defendant, B.S.R. Judge Tucci properly denied the extraordinary relief that was requested in this case in a thoughtful and succinct order after a full evidentiary hearing, the transcript for which, of course, is in the record. And I think as Judge Tucci keenly recognized, this dispute between two private parties is purely a dispute over money. It is, therefore, unsuited to preliminary equitable relief, especially where the merits of this case are set to be resolved in arbitration pursuant to the party's arbitration agreement, an arbitration that's scheduled currently for November of 2022. Could your client have, if Judge Tucci said, I'll give an injunction but require you to bond their loss, potential loss, could your client have done that financially? Your Honor, I think that the bond. Start with a yes or no. No, Your Honor. I think that the requirement to post a bond would be on the party obtaining the injunction, which would be boom in this case, which I think actually goes to why the injunctive relief requested here is so unsuited. Well, what they were telling the court, as I understand it, is our opponents have shut off the money supply, correct? That is what happened, right? Yes, Your Honor. Okay. And unless you either tell them to turn it back on or require them to post a bond that will protect us in the event we prevail in arbitration where all of the merits will be sorted out, what's wrong with that? Your Honor, that does not satisfy. Boom did not satisfy the elements of the preliminary injunction test set forth in winter, which require, of course, a likelihood of success on the merits, irreparable harm, and then the balance of hardships in the public interest test. Requiring BSR to post a bond here would not be consistent with requiring BSR to post a bond if boom had not satisfied those elements of the test. Well, flip it the other way. Let's assume there was no bond, but the district court had ordered your client to turn the money flow back on. Would that have been irreparable harm to you? Your client says the record clearly shows the answer to that question is no. What do you say? Your Honor, the evidence before the district court, as presented by boom, was that BSR had no ability to pay a judgment of between $10 million and $90 million. Boom made a strategic... Wrong side of the equation. The district court had ordered you to turn the money supply back on. What harm would that have been to your client other than that could not have been recovered, could not be recovered in an arbitration on the merits? Yes, Your Honor. I think that the harm there is that boom had breached the party's contract, and one of the consequences of breaching... That's not what I'm asking you about. I'm asking you to tell the panel what harm would have come to your company if you had to turn the money flow back on pending the resolution on the merits, which you seem quite confident you would have failed on, correct? Yes, Your Honor. I think that the harm is requiring a party to pay effectively a preliminary money damages award in a case where the other side has breached the contract, and the contract clearly provides for the termination of compensation upon a breach, like those that existed here. And so requiring BSR to pay that money, despite the consequences that flow from a breach of the contract, I think clearly would be very much harmful to BSR as it moves forward, given that what we saw was that the other party to the contract had breached not only the minimum production clause, but it engaged in solicitation in violation of the contract. Well, that's why, I mean, on the irreparable harm, it all boils down to money and whose ox is gored the most, and given the financial condition of the companies. So isn't that why we start at the beginning, and that is the merits, an assessment of the merits, either likely success on the merits or a serious harm. And the argument, as I heard it, is, well, yes, we have this minimum production clause, but two points they made on that. One, you're still getting, even when things are shut off, you're still getting the downstream revenue, and you should be stopped given the negotiations. So could you address that? Yes, Your Honor. I think that the starting point is the 2-6 clause itself, and if I may, I'd like to read it because it is very clear and it is the basis of the entire dispute. And the clause provides, and here independent contractor refers to BOOM, and this is page 53 of the record, if independent contractor fails to place at least two approved merchants every six months with BSR, then all compensation payable under this agreement will terminate. As the district court found at page 6 of the record, the parties do not dispute that by March 2021, that is when BSR terminated the compensation under the ICA, BOOM had not placed two merchants with BSR in the past six months. The contract is clear. The contract clearly was triggered by BOOM's failure to place two merchants within six months, and that is the end of the matter. But BOOM does raise a waiver and estoppel argument. I would point to the record at page 58 and 59, the independent contractor agreement provides for non-waiver. That precludes BOOM's argument that any sort of waiver here occurred that would free BOOM from the 2-6 clause. The parties in this dispute, as I understand it, agreed at the onset that the resolution of any merit dispute would be determined by arbitration, correct? Yes, Your Honor. Which would entail a more detailed look at the facts than could be presented in the context of a motion for preliminary injunction, correct? Yes, Your Honor. What would have been wrong with the district court saying, I know there are arguments saying that they breached, but all of you agreed to resolve these matters in arbitration, and I'm confident that the arbitrator, a process you both agreed to, can get to the bottom of all of these facts and find, not likely, but find that there was a breach or there wasn't, et cetera? What's wrong with that? What would have been wrong with that approach? It would violate federal law, primarily the winter test, which requires the plaintiff to make an extraordinary showing, starting with the likelihood of success on the merits, which is a threshold inquiry. And if the plaintiff cannot satisfy the likelihood of success on the merits question, then the court need not go any further. Any, most of the cases, will you concede that most of the cases that resolve requests for preliminary injunction on that basis involve situations where there's a motion but a trial to follow if there's no injunctive relief? Trial on the merits in district court or in state court. Would you agree? Yes, Your Honor. I do think that the contract here... Do you have any cases that deal with this situation where the effort to get a PI is in front of arbitration that the parties have agreed to? No, Your Honor, but I do think that the resolution of the case on the merits is the ultimate question, and whether that occurs in arbitration or in federal court should not affect how the preliminary injunction test under winter is actually applied. So to flip that around, I don't think that there is any case law that would support a different preliminary injunction test because the parties had agreed to resolve the ultimate merits in arbitration. It's basically requiring the district judge at that stage of the litigation to make a predictive ruling as to what the evidence is likely to show when the case is actually heard on the merits, is it not? Yes, Your Honor, and I think here the parties and the judge did a really good job of presenting a series of briefs, a series of evidentiary submissions through affidavits, and then a full two-day hearing where the parties had the opportunity to cross-examine and redirect the key witnesses in the case. Was there any discovery? No, Your Honor, there was no discovery. Well, usually there's often not in preliminary injunction, but I also take it that no matter what the district court does here denying the preliminary injunction, that none of those findings actually have any legs when you get into the arbitration. Is that true? I don't know exactly how the arbitrators will interpret Judge Tucci's opinion here, but I do think that his interpretation primarily of the plain language of the contract with respect to the 2-6, the minimum production clause, his interpretation of the non-solicitation clauses and the primary evidence in support of the fact that Boone breached those non-solicitation clauses, I think that those are certainly accurate and correct interpretations of both the governing agreements and the facts that unfolded. I just want to make sure I understand. The record was compiled, as I understand it, through affidavits, but also was there live testimony by Mr. Goody and who was from Boone? Mr. John Hines, the COO and general counsel. So there were two live witnesses who testified in front of Judge Tucci. There was also a third witness, Mr. Skinner, who was from a third party. Okay. Your Honor, I think that understanding the 2-6 clause, because that really does resolve the case and ends the case, we have to look at the parties' relationship as it developed after 2015. And in 2017, the parties entered into an agreement known as the Secured Residual Loan Agreement, and the parties for the first time entered into an exclusivity arrangement. And at page 449 of the supplemental record, that arrangement in section 2.11 of the 2017 agreement provided that Boone shall not solicit merchants for the merchant acquiring program of anyone other than BSR. This is important because it created a new obligation. The independent contractor agreement had specifically provided for the relationship to be non-exclusive. And then in October 2019, in email communications, attempting to move forward to a resolution of the parties' dispute, Mr. Goody negotiated dropping the, quote, exclusivity language in 2.11 of the June 2017 agreement. He testified that he was talking in that email specifically about section 2.11 of the 2017 agreement. There's no reference to the 2-6 clause in the ICA in the 2017 agreement, and there's no reference in the email to the 2-6 clause. That deal was ultimately consummated in December of 2019, and that ended the exclusivity. Page 241 of the supplemental record, that 2019 agreement provides that Boone's exclusive services obligation set forth in section 2.11 of the 2017 agreement shall terminate. So, again, there's nothing about the 2-6 clause. Importantly, that 2019 agreement clearly appreciated the existence and effect of the ICA as it referenced certain issues about fees charged under the ICA. But, again, it did not reference or affect or modify the 2-6 clause. So what the 2019 agreement did was bring the parties back to the status quo, which was Boone was a non-exclusive acquirer for BSR, and Boone also had the obligation to board two merchants every six months. There's really no dispute that the district court was correct, that no new agreement was made between BSR and Boone to eliminate the 2-6 clause. The final string to the bow, so to speak, Your Honor, is the February 2020 email in which Mr. Goody drew a distinction between boarding with a processor called First Data and boarding with a processor called TSIS. Mr. Goody's email to Mr. Hines here in February 2020, after that 2019 agreement had been executed, he says, I would think if we were going to board anything, it might be on TSIS. Mr. Goody then testified, BSR expected to continue to receive TSIS deals from Boone, but not necessarily First Data deals. And the reason was that Boone had engaged its own agreement with First Data after the parties had eliminated the exclusivity arrangement. So Boone had a sort of direct link to First Data, but BSR still expected the TSIS deals. The evidence also reflected that Boone had access to something called Access One, a sort of portal to facilitate the boarding of merchants with BSR. And thus, the district court found, as a matter of fact, that Mr. Goody was thus inquiring why First Data deals were going through BSR. The email did not waive or otherwise abrogate the 2-6 clause because BSR still expected Boone to submit new merchant applications for boarding with TSIS, another processor. The district court went on, BSR proffered credible evidence that Boone always had access to Access One, even if it was not Boone's preferred system. And at this point, I think it's important to recognize the appellate standard of review here. As this court has held repeatedly, even if there are two permissible views of the evidence, the district court's choice between them cannot be clear error. Cannot be clear error. With respect to the 2-6 clause. The standard actually goes a little further than that and says, even if we were reviewing the facts on our own for the first time, we might have come to a different conclusion. That still can't constitute clear error. Yes, Your Honor, I agree. And I was quoting from this court's opinion in Minidoka versus the Department of Interior, and the court has repeatedly stated that standard of review, which is very deferential to the district court's findings. The Supreme Court similarly has said that when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, that finding can virtually never be clear error. And so in order to meet this extraordinarily high burden to show clear error, Boone cannot simply point to competing evidence here on appeal. It cannot point to competing views of the evidence on appeal. It must establish a clearly erroneous factual finding, and it cannot do so here. With respect to the non-solicitation clauses, there were primarily three instances of solicitations of both merchants and employees that justified BSR's termination of the compensation. And I think it's also important to recognize that any one of these breaches that we're talking about, the 2-6 clause or any one of the three non-solicitation clauses found by the district court to have been breached, would have justified BSR's termination on its own. So first of all, the DA Gallery solicitation, this is the one with a recorded call, and I believe it begins at page 864 of the record. This is a recorded call between Amy Moorhead, who is a customer service representative for Boone, and an operator of a merchant by the name of DA Gallery, and they're discussing a point-of-sale equipment arrangement. And what Ms. Moorhead effectively did was slow walk the merchant through a switch. She told him that his account was basically under the control of BSR and that Boone was not boarding with BSR anymore. She told him that Boone was now a wholesale provider on its own and that Boone no longer used BSR's processing agreement for that point-of-sale equipment. She then said that she would refer him over to sales and that sales would be trying to switch him from our retail relationship with BSR over to our own wholesale relationship with BSR. Now, counsel for Boone drew a distinction between point-of-sale equipment and processing services, but the independent contractor agreement itself at the record page 48 specifically provides that BSR services, those covered by the non-solicitation clause, BSR services are specifically defined to include point-of-sale equipment. Therefore, this discussion about point-of-sale equipment and a new point-of-sale equipment arrangement with one of BSR's merchants was clearly a violation of the non-solicitation clause. As the district court found, the court finds that the solicitation was clear. Whether Boone ultimately was successful in boarding this merchant does not matter. The purpose of the non-solicitation clause is to prevent the party from attempting to steal the other party's merchants. So I think, as I read the district court's order, the district court found that it was likely shown that Boone did violate the non-solicitation clause, correct? Correct. And did the district court need to go further than that in terms of its factual determination? No, Your Honor. Your Honor, as this en banc court held in Garcia v. Google, an opinion through Your Honor, Judge McEwen, because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not even consider the remaining three winter elements. And I think it cannot be legal error when the district court properly identifies the winter factors, primarily that threshold inquiry, the likelihood of success on the merits. Here, was there a breach that justified the termination? And as Your Honor, again, in Lopez v. Brewer, indicated that there cannot be legal error if the district court analyzes the case pursuant to winter, which is what happened here. And I think, again, pointing back to Lopez v. Brewer, responding to an argument that's similar to that which Boone makes here, the court stated that to the extent that a plaintiff argues that the serious questions going to the merits consideration is a separate and independent analysis from the court's assessment of the plaintiff's likelihood of success on the merits, the plaintiff misunderstands our precedent. I think Boone also misunderstands this court's precedent to the extent that it would contend that there was any sort of legal error for failure to apply the so-called serious questions test. I would point the court, and I think Judge Hawkins pointed it out, that the district court specifically addressed the question about whether the balance of hardships tips decisively in Boone's favor. And that comes directly from the alliance for the Wild Rockies case. This sliding scale analysis that would allow the lower showing on the serious questions prong only comes into play if the balance of hardships tip decisively in favor of one party or the other. And I think the district court weighing the evidence, giving Boone the benefit of the doubt, which was that Boone contended that it needed the money to stay in business, and it also contended at the very same time that BSR was broke and would not have the money to pay damages. Giving Boone the benefit of the doubt, the balance of hardships clearly did not tip, let alone decisively. The last thing I would say, Your Honors, before my time expires, is that this was a mandatory injunction. The status quo, the last peaceable, uncontested status between the parties, was in fact the status where Boone was not in breach of the party's contract. So requiring BSR to pay money over to Boone, even though Boone had breached the party's contract, would have been a mandatory injunction. We would therefore ask that the court affirm the district court's denial of the motion for preliminary injunction. Thank you. You have 32 seconds, which is hard to say anything, so why don't we put a minute on the clock, if you would, Ms. Bremner. Responding quickly backwards, the Maryland non-nutraceuticals case from this court notes that preliminary injunction is the last uncontested status, which preceded Penn before the dispute. That's clearly on March 29th. We brought an injunction on April 16th, so I don't think the mandatory injunction argument carries weight under the facts of this case. The reason that we filed an appeal is because we believe that Judge Tucci did not apply the alliance test. Maybe he applied winter, he notes it in his opinion, he talks about likelihood of success on the merits, he finds various breaches might be likely, clearly to fit within the likelihood of success on the merits type test, in order that he did not have to get to the serious questions test. But then what's the point? We went into the injunction showing irreparable harm, uncontroverted. Then we went to serious question. I asked the witness. He said there were serious questions. Mr. Edwards actually, in closing, said that I was clever by doing that. I wasn't being clever. I was asking the person, are there serious questions as to the evidence? He said yes. And finally, it tipped in our favor because they showed zero harm to them, zero harm. If it tips in our favor, we show irreparable harm, then we get the serious questions test. We're asking this court to remand for Judge Tucci to review the evidence under the serious question test. He may very well come to the same conclusion. But when he found that the balance of hardships did not tip in one side or the other, that was an error of fact. There's not one scintilla of evidence, no evidence, zero, that they suffer any harm if the injunction issues. Go ahead. How do you distinguish our Garcia versus Google statement that once the district court determines that you don't meet likelihood of success on the merits, it doesn't need to go any further? Well, I'm not sure that the judge found that under the facts of our case. He has to look at the facts of the case under alliance in order to make that determination. And when he determined that the balancing was wrong. An in-bank opinion trumps a three-judge panel decision, does it not? It does. Okay. Okay. Thank you. Thank you. I appreciate that argument and briefing of both counsel. The case just argued is submitted and we're adjourned for the morning. All rise. This court for this session stands adjourned.
judges: HAWKINS, McKEOWN, TALLMAN